IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 20, 2004 Session

## BRUCE MCGEHEE, M.D. v. OTIS A. PLUNK, M.D.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-01-1877-2     Arnold B. Goldin, Chancellor**

_____

**No. W2003-01332-COA-R3-CV - Filed August 3, 2004**

_____

A judgment was rendered against corporation, of which Defendant is 100% owner. Plaintiff sought to recover judgment from Defendant's corporation but was unsuccessful. Plaintiff filed suit against Defendant alleging that conveyance made between corporation and Defendant was fraudulent. The trial court found the conveyance fraudulent and assessed the judgment against the Defendant, personally. For the following reasons, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID G. HAYES, SP. J., joined.

William P. Zdancewicz, Memphis, Tennessee, for the appellant, Otis A. Plunk, M.D.

Stephen R. Leffler, Memphis, Tennessee, for the appellee, Bruce McGehee, M.D.

### OPINION

On December 18, 1998, Lifesigns of Memphis, P.C. (Lifesigns 1) filed a petition for a temporary restraining order and injunctive relief against Bruce McGehee, M.D. (Dr. McGehee). In the petition, Lifesigns 1 alleged that it terminated its employment contract with Dr. McGehee. Based upon non-solicitation and confidentiality clauses contained in the employment contract, Lifesigns 1 sought to enjoin Dr. McGehee from communicating in any way with Lifesigns 1's patients and accounts for ten years after his termination. On June 29, 1999, Dr. McGehee answered the petition and counter-complained against Lifesigns 1 and its owner, Otis Plunk, M.D. (Dr. Plunk). In the counter-complaint, Dr. McGehee alleged that Lifesigns 1 and Dr. Plunk breached the employment contract and an implied duty of good faith and fair dealing, and further

that his discharge was retaliatory. In its judgment,[1] the trial court granted Dr. McGehee's breach of contract claim; denied the claims of breach of an implied duty of good faith and fair dealing and retaliatory discharge; awarded damages against Lifesigns 1 in the amount of $32,610.33, including an award of attorney's fees; and required Lifesigns 1 to surrender to Dr. McGehee all shares of stock in the possession of Lifesigns 1 to Dr. McGehee.

On September 10, 2001, Dr. McGehee filed a complaint to set aside an alleged fraudulent conveyance made by Dr. Plunk. In the complaint, Dr. McGehee alleged that, after he filed his counter-complaint against Lifesigns 1 and Dr. Plunk, Dr. Plunk liquidated the account receivables of Lifesigns 1 and deposited them into his personal account. Dr. McGehee complained that the transfer of funds from Lifesigns 1 to Dr. Plunk was done without adequate consideration and intended to render Lifesigns 1 insolvent. Dr. McGehee sought to have the $32,610.33 judgment from his breach of contract claim assessed against Dr. Plunk personally.

Trial for Dr. McGehee's claim of fraudulent conveyance occurred on February 13 and 14, 2003. At the conclusion of the proof, the trial court made the following observations:

In this case we have the defendant, Dr. Otis Plunk, who is not only a physician but, I guess by his own testimony, a sophisticated businessman who has an M.B.A. Degree from Vanderbilt and has the entrepreneurial desire to not only practice medicine but to set up clinics, not on a sole franchise basis, but essentially a chain of clinics for the purpose of performing physical examinations for corporations. Dr. Plunk recruited Dr. McGehee from North Carolina to operate [Lifesigns 1] so that he [Dr. Plunk] could . . . open up the Life Signs of Nashville clinic [Lifesigns 2]. This was back in April of 1998 when Dr. McGehee, I guess it was March of '98 perhaps, when Dr. McGehee moved to Memphis and Dr. Plunk moved to Nashville in April of '98. Subsequent disagreements arose between Dr. McGehee and Dr. Plunk. And in December of '98 [Dr. McGehee] was discharged from [Lifesigns 1].

Dr. Plunk has testified about the various entities that this company became - - moved from [Lifesigns 1], the stock was transferred in March of '99 to [Lifesigns 2] and then to O.A.P. and Associates [Lifesigns 3] and subsequently to Life Signs Holding Company [Lifesigns 4]. Meanwhile the day after Dr. McGehee is discharged, [Lifesigns 1], files a petition for temporary restraining order in the form of relief in Circuit Court of Shelby County seeking to restrain Dr. McGehee from solicitations and whatnot and these courts are used to enforce an injunction against Dr. McGehee. Subsequently, Dr. McGehee retained counsel. An answer to the complaint was filed and a counter-complaint was brought against [Lifesigns 1] in June of '99. We now know that in March of '99, apparently, the stock of [Lifesigns 1] was transferred to [Lifesigns 2].

---

[1] While appellant's brief states that injunctive relief was granted against Dr. McGehee, the interim and final judgment, entered March 26, 2001 and May 22, 2001, along with the record as a whole, do not support such a resolution.

As part of the proof in this case, Dr. Plunk's deposition and an execution of judgment that was taken on August the 8th of 2001 and was admitted as Exhibit six. Dr. Plunk testifies in that deposition on page five, line 23 "Does [Lifesigns 1] still exist?" And he answers, "Yes." Page six, "And is that still the name of the corporation, [Lifesigns 1]?" And he answered, "Yes." And he states, "And I notice that you have handed me a stock certificate that was mentioned in the order of the court, the final order and it has a date on the 23rd day of May of 2001. Are you familiar with that stock certificate?" And he said, "Yes." ["]And do you agree with me that today, August the 8th of 2001 is when you handed me that stock certificate for the first time?" Answer, "Yeah, I gave it to my attorney Bill Zdancewicz." On page seven, "What is your position [with Lifesigns 1]?" Answer, "I no longer have a position with the company". Question, "Are you an officer director?" "No." Line 12, "What corporations are you an officer of?" Answer, "[Lifesigns 4]." And page eight, line 15, "Are you on the board of directors?" Answer, "Yes." Question, "[Lifesigns 4]?" Answer, "Yes." "And are you still president of the board?" Answer, "Yes." Page ten, line four, "What is the relationship, if any, between [Lifesigns 3] and [Lifesigns 4].?" Answer, "[Lifesigns 4] owns 99 percent of [Lifesigns 3], approximately." Line 13, "Does [Lifesigns 1] own any assets?" Answer, "Not that I am aware of." Question, "When was the last time that [Lifesigns 1] owned any assets?" Answer, "There was small bank account balances - - in late - - early 2000." Question, "Late '89 or '98?" Answer, "Late '99." "Okay." Page 11, line four, "And it was shortly after that you're saying that [Lifesigns 1] transferred its assets to [Lifesigns 4]?" Answer, "Yes." "And that would have occurred in early 1999, correct?" "Yes." Question, "So I would be correct in saying that when [Lifesigns 1] filed an answer to a counter-complaint and filed that answer on June the 26th of 2000, then at that time, [Lifesigns 1] had already transferred its assets to [Lifesigns 4][,] is that correct?" Answer, "It had sold assets at that time, yes." Question, "And what were the terms of the sale of those assets? What did [Lifesigns 4] pay for those assets?" Answer, "Essentially outstanding accounts receivables." ["]There may have been some accounting charges or, you know, to recoup depreciation." Question, "What you're saying is that [Lifesigns 1] transferred its accounts receivables to [Lifesigns 4]?" Answer, "No. That's the only thing it retained." Question, "The only thing that [Lifesigns 1] retained was its accounts receivable?" Answer, "Correct." "Then what was transferred to [Lifesigns 4] at that time?" Answer, "Well, it wasn't anything else." Line 22, "So these would have been accounts receivable from insurance companies[,] is that correct?" "Correct." Page 13, line 18, "What did [Lifesigns 4] pay to [Lifesigns 1] for those accounts receivable?" "Rephrase that. Just repeat it." Question, "What did [Lifesigns 4] pay to [Lifesigns 1] for those accounts receivable that were transferred to [Lifesigns 4]?" Page 14, line two, "Well, I mean, it didn't. [Lifesigns 4] didn't get the receivables." Question, "Who got the receivables?" "[Lifesigns 1] retained the receivables." "So then, [Lifesigns 1] didn't transfer anything to [Lifesigns 4]; is that correct, because the only thing they had was receivables?" Answer, "Right." Question, "But

-3-

[Lifesigns 1] , as I understand it, it no longer holds those receivables[,] is that correct?"  Answer, "Well, I was a hundred percent owner of [Lifesigns 1] [a]nd so essentially, those were - - it was a subchapter S corporation.  So I essentially paid tax and used those proceeds personally, paid taxes and used those proceeds personally."  Page 15, "Did you pay the [Lifesigns 1] any money in exchange for what you received from the corporation?"  "No."  "How much did you write yourself a check for?"  "In the neighborhood of probably $100,000.00.["]  "And when you received that money from [Lifesigns 1], I mean, it came over a fairly prolonged period of time."  Question, "But it went into your personal account?"  "No.  It went into [Lifesigns 1] and on occasion I would take money."  "You would put that money where?"  Answer, "In my personal account."

Now, Dr. Plunk was the - - this was a subchapter S corporation.  And he's testified in his deposition on page 14 that he was a one hundred percent owner of [Lifesigns 1] on the stand.  And this is after giving - - previously giving earlier in the deposition, this stock interest to Dr. McGehee.  Dr. Plunk testified on the stand that Dr. McGehee had an ownership interest in [Lifesigns 1]  He also testified that the only thing that [Lifesigns 1] had at the time of this transfer to  [Lifesigns 4], which was frankly, apparently, a couple of transfers later, according to his testimony on the stand, where these accounts receivable, which he kept a hundred percent of because he stated that he was a hundred percent owner of [Lifesigns 1].  This is after filing a petition in the Circuit Court on December the 18th of '98 and subsequently filing an answer to the counter-complaint.

This is all very confusing.  There is no question about it.  Dr. Plunk is obviously very sophisticated at handling these matters in conjunction with his accountants and his attorneys.  But in the court's eyes, which it appears to the court that the timing of these transfers and the fact that Dr. Plunk was aware at the time that the transfers were made directly into his personal account from the only assets that were available to pay any judgment that might have been rendered in this matter in the lawsuit that his company filed.  The company that he testified he was a hundred percent owner of is an attempt to defraud Dr. McGehee.  And as a result the conveyances - - this court finds that there was a fraudulent conveyance in an attempt to defraud a valid creditor.  And that a judgment should be entered against Dr. Plunk individually in the amount of $32,610.32.

The court will not render a judgment in the amount in the value of the stock because there is testimony that the stock may have a value of anywhere between - - no, you can't base stock on what someone pays for stock.  All of us who own stock know that.  The only testimony that we have on that is that the stock and whatever this ultimate entity might be is anywhere from zero to ten million dollars.  And presumably if there's any value to the stock which there may or may not be or we may be talking about perhaps litigation down the road on that issue.  But this court

can't deal on speculation and can't - - there's no way to put any value on that at this point. And ultimately we'll have to see what happens, I guess, in January or July of '05 whenever that's supposed to take place. But Dr. McGehee has a judgment in Circuit Court. It was found he had a valid judgment found by the Circuit Court of this county. And this court finds that the judgment should be entered against Dr. Plunk personally for that judgment. (The trial court is quoting portions of Dr. Plunk's deposition, Exh. 6)

Dr. Plunk timely filed his notice of appeal.

## Issues Presented

Dr. Plunk raises the following issue, as we restate it, for review by this Court:

Whether the trial court erred in finding that Dr. Plunk made a fraudulent conveyance.

## Standard of Review

Our review of a trial court's conclusions on issues of law is *de novo*, with no presumption of correctness. *Kendrick v. Shoemake*, 90 S.W.3d 566, 569 (Tenn. 2002). Our review of a trial court's findings on issues of fact is *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Kendrick*, 90 S.W.3d at 569. Where the trial court makes no specific findings of fact on a matter, we must review the record to determine where the preponderance of the evidence lies and accord no presumption of correctness to the conclusion of the court below. *Kendrick*, 90 S.W.3d at 569.

## Analysis

Dr. Plunk argues that the trial court erred in finding that the transfers in controversy satisfy the elements required in Tenn. Code Ann. § 66-3-305 (1993)[2] to deem a conveyance fraudulent.[3] Tennessee Code Annotated § 66-3-305 provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to such person's actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

---

[2]The 1993 version of the statute will be applied in this case as the trial occurred before the effective date of the amendment, July 1, 2003. *See* Tenn. Code Ann. § 66-3-305 (2003) (amendments).

[3]Dr. Plunk also argues that the conveyance should not be deemed fraudulent because it did not violate Tenn. Code Ann. § 66-3-101 (1993). We will not address this argument because a conveyance can be deemed fraudulent under either Tenn. Code Ann. § 66-3-101 or § 66-3-305.

Tenn. Code Ann. § 66-3-305. Further, "[t]o make a conveyance fraudulent against creditors, it must be made without a fair consideration leaving the grantor insolvent." *Macon Bank & Trust Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986) (citing *Hicks v. Whiting*, 258 S.W. 784 (Tenn. 1924)).

We will address the insolvency requirement first. Tenn. Code Ann. § 66-3-302 (1993) defines insolvency as "[a] person[4] is insolvent when the present fair salable value of the person's assets is less than the amount that will be required to pay the probable liability on such person's existing debts as they become absolute and matured." Dr. Plunk argues that Lifesigns 1 "had significant net worth at the time of the transfer of its' assets." However, in answering the garnishment to the judgment rendered against Lifesigns 1 from the original suit, Lifesigns 1 stated "[t]hat the judgment debtor does not hold any wages or benefits of the judgment creditor, [Dr. McGehee, and] [a]s further answer the judgment debtor states that it does not own any goods, channels, lands and tenements in order to answer the subject garnishment." As a result, Dr. Plunk is precluded from arguing that Lifesigns 1 was not insolvent as it is defined in Tenn. Code Ann. § 66-3-302.

The second element required for a conveyance to be deemed fraudulent under Tenn. Code Ann. § 66-3-305 is that the conveyance must be made without fair consideration. Dr. Plunk argues that the payment of the accounts receivable from Lifesigns 1 to his bank account was fair consideration because he was paying himself his salary. Tennessee Code Annotated § 66-3-304 (1993) defines fair consideration as "in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." While there was testimony at trial that it was customary for Lifesigns 1 to pay Dr. Plunk's salary from the account receivables, when there was money available, there was also testimony given by Dr. Plunk that questions whether the exchange was made in good faith. Dr. Plunk testified that his payments from the accounts receivable were not consistent. He would take out some here and there and pay Lifesigns 1's monthly expenses. Dr. Plunk further testified, in his deposition, that in early 1999, Lifesigns 1 transferred its assets to Lifesigns 4. He later testified that Lifesigns 1 did not transfer any assets to Lifesigns 4. But instead, Dr. Plunk took $100,000 from Lifesigns 1's accounts receivable and deposited it into his personal bank account. This transfer coincides with the dates that Dr. Plunk testified that Lifesigns 1 did not have any assets. As a result, Dr. Plunk's liquidation of Lifesigns 1's remaining assets would have been done during the litigation, which resulted in a judgment being entered against Lifesigns 1. The trial court found the nature and timing of these transactions confusing and we concur in that assessment. Based upon this testimony and the credibility of Dr. Plunk, the trial court concluded that these transactions were fraudulent. We also believe that Dr. Plunk's complete liquidation of the remaining assets of Lifesigns 1 during the

---

[4]While the statute uses the word "person," the statute's definition of insolvency is also applicable to corporations. *See Hyde Props. v. McCoy*, 507 F.2d 301, 307 (6th Cir. 1974).

litigation was not done in good faith as it is enumerated in Tenn. Code Ann. § 66-3-304. Accordingly, we affirm the finding of the trial court that Lifesigns 1 made a fraudulent conveyance.[5]

## **Conclusion**

In light of the foregoing, we affirm the decision of the trial court assessing the $32,610.33 against Dr. Plunk, personally. Costs of this appeal are taxed to the Appellant, Otis A. Plunk, M.D., and his surety, for which execution may issue if necessary.

                               _____

                               DAVID R. FARMER, JUDGE

---

[5]Dr. Plunk does not raise the issue of whether the trial court could have assessed the judgment against Dr. Plunk, personally, upon the finding of a fraudulent conveyance, as defined by Tenn. Code Ann. § 66-3-101 or § 66-3-305, so we do not reach the propriety of that action.